IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JUAN CARLOS BORUNDA and
MARIO ALBERTO BORUNDA,

        Plaintiffs,

v.                                                                               No. CV 12-00396 WJ/WPL

JOHN F. KERRY, U.S. SECRETARY OF STATE,

        Defendant.

## COURT'S
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER is before the Court following a three-day bench trial held in the above-captioned case before the undersigned on July 29 through 31, 2015. Plaintiffs Juan Carlos Borunda and Mario Alberto Borunda and Defendant John F. Kerry, United States Secretary of State ("Defendant") submitted proposed findings and conclusions of law. Having considered the testimony of the witnesses at trial and the evidence admitted, and having considered the oral and written arguments of counsel, the Court finds in favor of Plaintiffs Juan Carlos Borunda and Mario Alberto Borunda.

### FINDINGS OF FACT

As required under Federal Rule of Civil Procedure 52(a)(1), the Court finds the following facts:

1. Marin Borunda, who was born in the small rural community of San Onofre, State of Chihuahua, Country of Mexico, illegally entered the United States in the 1970s, when he

was a teenager. He initially lived in Texas and started doing agricultural work and then started doing oil field service work because he could earn more money. Sometime around 1980, Marin Borunda moved to Lovington, New Mexico where he still lives and still works in the oil fields in New Mexico and Texas. San Onofre, Chihuahua, is an eight to ten hour drive from Lovington, New Mexico.

2. Marin Borunda became a lawful permanent resident of the United States in 1982. He became a naturalized citizen of the United States within the past decade. Marin Borunda is Plaintiffs' biological father.

3. Lydia Borunda, who was born in Mexico, illegally entered the United States in approximately 1980. She became a lawful permanent resident of the United States in 1988 and a naturalized citizen of the United States in 1998. Lydia Borunda is Plaintiffs' biological mother.

4. Marin and Lydia Borunda have one other child, an older son named Aaron Borunda, who is not a party to this proceeding. There is no dispute of fact that Aaron Borunda is a United States Citizen since he was born in a hospital at Portales, New Mexico, on October 21, 1982.

5. During and after the birth of Aaron Borunda, Lydia Borunda experienced serious health complications that required her to remain hospitalized for two weeks. This hospital stay was expensive, requiring Marin and Lydia Borunda to enter into a payment plan that was eventually paid in full. Following these complications, Lydia Borunda determined that she never wanted to return to a hospital.

6. At some point following the birth of Aaron Borunda, his parents filed a civil registry document in Mexico indicating that he was born in Mexico.

7. Marin, Lydia, and Aaron Borunda lived together in Lovington, New Mexico, prior to Plaintiffs' births, starting approximately in February 1984. City of Lovington records indicate that Marin and Lydia Borunda have had water, sewer and garbage services in that city since February of 1984. During this time period, the closest hospital with a neo-natal unit was in Hobbs, New Mexico which is about a thirty-minute drive from Lovington.

8. Marin Borunda began employment with Ferguson Construction Company, based in Lovington, on March 8, 1984. He continued this employment through May 24, 2005.

9. On September 16, 1984, Plaintiff Juan Carlos Borunda was born to parents Marin and Lydia Borunda at 311½ West Avenue F, Lovington, New Mexico. At the time of Juan Carlos Borunda's birth, Marin and Lydia Borunda were living in a mobile home located at this address. Lydia Borunda was assisted in this birth by Maria J. Viscaino, a midwife. Marin Borunda was at work at the time Lydia Borunda gave birth to Plaintiff Juan Carlos Borunda.

10. Following the birth of Plaintiff Juan Carlos Borunda, Ms. Viscaino prepared the paperwork for his New Mexico birth certificate. After receiving the necessary information from the parents, Ms. Viscaino submitted this paperwork.

11. As a result of the paperwork submitted by Ms. Viscaino, Plaintiff Juan Carlos Borunda's New Mexico birth was registered on November 19, 1984, in Lea County, as set forth in his New Mexico birth certificate.

12. The Court finds the testimony of Lydia Borunda and Ms. Viscaino concerning the birth of Plaintiff Juan Carlos Borunda and the registration of his birth to be credible. These witnesses sometimes gave conflicting testimony concerning certain specific details, and

Ms. Viscaino, who is over the age of ninety, lacked detailed recall of those events. Nonetheless, both witnesses testified that Plaintiff Juan Carlos Borunda was born in the Borunda family's trailer in Lovington, and this uncontradicted testimony was largely consistent. This testimony was also largely consistent with the credible testimony of Marin Borunda and the testimony of the child's godmother, Dolores Ana Borunda, neither of whom were present for the birth but both of whom testified concerning the circumstances immediately before and after the birth of Plaintiff Juan Carlos Borunda. The Court also recognizes that some inconsistency as to the testimony is to be expected, given that the event in question occurred almost thirty-one years ago.

13. Plaintiff Juan Carlos Borunda was baptized at the Archdiocese of Chihuahua in Satevo, Chihuahua, Mexico, on September 29, 1984. Present at his baptism were his parents, Marin and Lydia Borunda, and his godparents, Salomé and Dolores Ana Borunda. His certificate of baptism states that Plaintiff Juan Carlos Borunda was born in Lovington, New Mexico.

14. At some point following the birth of Plaintiff Juan Carlos Borunda, his parents filed or caused to be filed a civil registry document in the State of Chihuahua, Mexico. This civil registry document falsely indicates that Plaintiff Juan Carlos Borunda was born in San Onofre, Chihuahua, Mexico on April 16, 1984. His parents filed this document, or caused it to be filed, because his father was born in San Onofre and because his father wanted to secure for him the benefits of Mexican citizenship and identity.

15. In 1986, after becoming pregnant again, Lydia Borunda desired to give birth utilizing the services of a midwife. She was unable to locate Ms. Viscaino, so after consulting with women at her church, Lydia Borunda was given the name of another midwife, Margarita

Nanez. Lydia Borunda contacted Ms. Nanez, and the two arranged for Ms. Nanez to provide her services as a midwife at Ms. Nanez's home in Sunray, Texas. Sunray is a small city located in the northeast part of Moore County, which is located in the north-central part of the Panhandle of Texas.

16. During the week of November 27, 1986, Marin Borunda dropped off Lydia Borunda at Ms. Nanez's Sunray home with the expectation that Lydia Borunda would give birth sometime that week. Marin Borunda then returned to his job in Lovington, while Dolores Ana Borunda watched Aaron and Juan Carlos Borunda.

17. On November 27, 1986, Lydia Borunda gave birth to Plaintiff Mario Alberto Borunda at Ms. Nanez' residence, 303 Avenue P in Sunray, Texas. Lydia Borunda was assisted in this birth by Ms. Nanez. Marin Borunda was not present for this birth.

18. Approximately a week after dropping Lydia Borunda off at Ms. Nanez's home, Marin Borunda drove to Sunray, picked up his wife and newborn child, and returned them to the family residence in Lovington, New Mexico.

19. At some point after the birth of Plaintiff Mario Alberto Borunda, Ms. Nanez prepared and submitted the paperwork for his Texas birth certificate. As a result of the paperwork submitted by Ms. Nanez, Plaintiff Mario Alberto Borunda's Texas birth was registered on February 23, 1987, in Moore County, as set forth in his Texas birth certificate.

20. Ms. Nanez died in 2005.

21. The Court finds Lydia Borunda's testimony concerning the birth of Plaintiff Mario Alberto Borunda and the registration of his birth to be credible. There were some inconsistencies in her testimony concerning some matters, such as whether she visited Sunray before giving birth and whether she returned to accompany Ms. Nanez when the

latter submitted the paperwork to register the birth. Nonetheless, the Court again recognizes that some uncertainty and inconsistency as to the details and exact sequence of events is to be expected, considering that the subject matter of Lydia Borunda's testimony concerned events occurring almost twenty-nine years ago. Lydia Borunda's testimony as to these events was largely consistent, and this testimony was consistent with the testimony of Marin Borunda and Dolores Ana Borunda, neither of whom were present for the birth of Plaintiff Mario Alberto Borunda but both of whom testified concerning the circumstances before and after this event.

22. Plaintiff Mario Alberto Borunda was baptized at St. Thomas Aquinas Parish in Lovington, New Mexico, on June 7, 1987. His certificate of baptism states that he was born in Sunray, Texas.

23. At some point following the birth of Plaintiff Mario Alberto Borunda, his parents filed or caused to be filed a civil registry document in the State of Chihuahua, Mexico. This civil registry document indicates that Plaintiff Mario Alberto Borunda was born in an unspecified city in the State of Chihuahua, Mexico on November 27, 1986. His parents filed this document, or caused it to be filed, because his father was born in San Onofre and because his father wanted to secure for him the benefits of Mexican citizenship and identity.

24. Following his birth in 1984, Plaintiff Juan Carlos Borunda spent the vast majority of his life living in Lovington, New Mexico. He is employed by an oil field services company and works in the oil fields in New Mexico and Texas. Plaintiff Juan Carlos Borunda is married, and he, his wife, and their children live in Lovington, New Mexico.

25. Following his birth in 1986, Plaintiff Mario Alberto Borunda spent the vast majority of his life living and working in Lovington, New Mexico, until 2009, after his fiancée's visa application was denied and the U.S. State Department challenged his United States citizenship.

26. At no time has Plaintiff Juan Carlos Borunda ever represented or held himself out to be a Mexican citizen. To the contrary, Plaintiff Juan Carlos Borunda has always considered himself to be a natural born citizen of the United States.

27. With the exception of the affidavit document Plaintiff Mario Alberto Borunda signed at the United States Consulate in Ciudad Juárez on September 17, 2009, Plaintiff Mario Alberto Borunda has never represented or held himself out to be a Mexican citizen, and he still considers himself to be a natural born citizen of the United States.

28. In light of the testimony and other evidence presented during trial, the preponderance of the evidence establishes that Plaintiffs were both born in the United States. The alternative theory presented at trial by Defendant—in essence, that Lydia Borunda traveled to San Onofre to give birth to each Plaintiff—defies reason and common sense. There is no factual dispute whatsoever that Marin and Lydia Borunda gave birth to their first child in the United States, or that the Borunda family lived in Lovington at all relevant times thereafter. To accept Defendant's theory, the Court would have to accept, without any significant supporting evidence, that in 1984 Lydia Borunda, an illegal alien at the time she gave birth to Plaintiff Juan Carlos Borunda, travelled eight to ten hours from Lovington to San Onofre, near the end of her pregnancy, without legal papers allowing her to return to the United States, while leaving behind her two year old son and possibly her husband, and then return with a newborn child thereafter. The risks to her

health, and the possibility that she might end up stranded from her husband and son if she were unable to safely return across the border, makes that theory exceedingly unlikely in the absence of any affirmative evidence in support. Moreover, Defendant would have the Court believe the same scenario occurred in 1986, when Lydia Borrunda gave birth to Plaintiff Mario Alberto Borrunda. By contrast, Plaintiffs' theory of the facts surrounding their birth is supported by the credible testimony and evidence that they presented.

29. Prior to September 2009, while visiting Mexico for a family member's quinceañera, Plaintiff Mario Alberto Borunda met and fell in love with Beatris Angelica Borunda Rodriguez, who is now his wife.

30. On September 17, 2009, Plaintiff Mario Alberto Borunda went with Ms. Borunda Rodriguez, who was his fiancée at the time, and his mother Lydia Borunda to the United States Consulate located in Ciudad Juárez, Chihuahua, Mexico, for the purpose of securing a K-1 "fiancée visa" for Ms. Borunda Rodriguez.

31. While at the Consulate, Lydia Borunda signed a sworn affidavit asserting that Plaintiffs were both born in unknown hospitals in Chihuahua and that she purchased fraudulent American birth certificates for Plaintiffs Juan Carlos and Mario Alberto Borunda from a doctor and a midwife, respectively. At trial, Lydia Borunda disavowed that affidavit and its contents, claiming that she felt coerced at the time she gave that statement due to the presence of armed personnel at the Consulate, the length of her interviews by consular agents, the environment where she gave her statement, her lack of food and water during the interview process, her depression, her failure to take her prescribed antidepressant before or during the interviews, and her belief that she could not terminate the interviews and leave the Consulate unless she signed the statement. Lydia Borunda further testified

that she was made to sign several forms before any statement was recorded on them and that she was also made to sign blank pieces of paper.

32. In the late afternoon or early evening on the same date, Plaintiff Mario Alberto Borunda signed a sworn affidavit at the United States Consulate in Ciudad Juárez. In that affidavit, he declared that consular employees had just told him that he was born in Chihuahua, Chihuahua, Mexico, and that his mother Lydia Borunda had informed him of this purported fact several months earlier. At trial, Plaintiff Mario Alberto Borunda disavowed the affidavit and its contents, claiming that he signed the statement without reading it because he saw that his mother was distressed and wanted to get her out of the Consulate.

33. The Court does not credit Lydia Borunda's testimony that she was coerced into signing the sworn affidavit in question. The credible testimony of Maria Estella Padilla, a fraud prevention manager working at the Consulate at that time, and that of Mario Rubio, a fraud investigator with the Consulate in September 2009, established that water fountains, vending machines, and/or food and drink vendors were located in the Consulate and available to the public, including interviewees. Lydia Borunda admitted that she did not ask for any food or access to her medication, and she did not testify that any agent or employee at the Consulate expressly forbade her from acquiring these items or leaving the interview. The Court further finds that Ms. Padilla and Mr. Rubio were credible in their testimony that consular applicants and interviewees were only made to sign blank pieces of paper for the purpose of comparing signatures when investigating possible forgeries. Finally, the testimony did not conclusively establish that personnel with firearms were stationed in the waiting area or interview area where Lydia Borunda

gave her statement. However, the Court recognizes that United States embassies and consulates are frequently the target of security threats. *See, e.g.*, Tim Arango, *Attackers in Istanbul Open Fire Outside U.S. Consulate*, N.Y. TIMES, Aug. 11, 2015, at A4, http://www.nytimes.com/2015/08/11/world/europe/us-consulate-istanbul-attack.html. Thus, even if armed personnel were present throughout the Consulate, the Court does not find their presence in such a location to be inappropriate.

34. On the other hand, the Court does not give much weight to the contents of Lydia Borunda's affidavit. Although the Court finds that Lydia Borunda was not coerced into giving or signing this statement, the Court credits her testimony at trial that during her interview, she felt desperate, anxious, sick, fearful, and unable to concentrate due to her failure to take her antidepressant and her failure to eat or drink anything before or during the interview. Moreover, while the contents of her affidavit find no additional support in the record, Lydia Borunda's contrary testimony at trial was largely supported by the documentary and testimonial evidence presented by Plaintiffs. For example, although the affidavit states that Lydia Borunda paid a doctor to procure an American birth certificate for Plaintiff Juan Carlos Borunda, Defendant offered no evidence at trial to contradict the substantial evidence that Ms. Viscaino, who is a midwife and not a doctor, was the only person other than Lydia Borunda involved in registering Plaintiff Juan Carlos' birth in New Mexico.

35. Similarly, the Court gives no weight to the September 2009 affidavit of Plaintiff Mario Alberto Borunda. The Court disregards as hearsay his statements in the affidavit concerning the circumstances of his birth as relayed by Lydia Borunda and the consular employees, as he understandably does not recall those circumstances firsthand. The

remaining contents of the affidavit are not directly material to the factual and legal questions before the Court in this action. Further, the Court credits Plaintiff Mario Alberto Borunda's testimony that he signed the affidavit without reading it because he wanted to end his mother's distress and remove her from the Consulate. This testimony was not contradicted by any other testimony or evidence.

36. Following the events of September 17, 2009, consular employees denied Ms. Borunda Rodriguez's application for a K-1 visa and informed Plaintiff Mario Alberto Borunda that he should not return to the United States because he had fraudulently obtained his passport. Some years later, after Plaintiff Mario Alberto Borunda had returned to the United States, the United States Department of State sent him a letter notifying him of the official revocation of his passport.

37. By letter dated September 23, 2011, the United States Department of State notified Plaintiff Juan Carlos Borunda that it had also revoked his United States passport.

38. As of this date, the United States Department of State has taken no action to revoke Aaron Borunda's citizenship or to otherwise challenge his United States citizenship.

## CONCLUSIONS OF LAW

Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court states the following conclusions of law:

1. Plaintiffs bring this action under the provisions of 8 U.S.C. § 1503(a) on the basis that they have been denied a right and privilege as United States citizens, specifically the issuance of their United States passports. The statute generally allows any person who has been denied a right or privilege on the basis of non-nationality to institute an action under 28 U.S.C. § 2201 against the head of the relevant department or agency for a

judgment declaring him to be a national of the United States. *See Vance v. Terrazas*, 444 U.S. 252, 256 (1980).

2. In an action under 8 U.S.C. § 1503(a), the plaintiff bears the burden to establish United States citizenship by a preponderance of the evidence. *See, e.g.*, *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 394 (5th Cir. 2006); *De Vargas v. Brownell*, 251 F.2d 869, 871 (5th Cir. 1958).

3. There are "two sources of citizenship, and two only: birth and naturalization." *Miller v. Albright*, 523 U.S. 420, 423 (1998) (quoting *United States v. Wong Kim Ark*, 169 U.S. 649, 702 (1898)). A person is a United States citizen only by the manner and means prescribed by Congress, and not otherwise. *See INS v. Pangilinan*, 486 U.S. 875, 883-884 (1988) (citations omitted).

4. The Court finds by a preponderance of the evidence that Plaintiffs Juan Carlos Borunda and Mario Alberto Borunda were born in the United States at the times and places described in their respective United States birth certificates. Thus, viewing the evidence in the record as a whole, Plaintiffs Juan Carlos Borunda and Mario Alberto Borunda have met their burden of proving citizenship by a preponderance of the evidence. Pursuant to 8 U.S.C. § 1503(a) and 28 U.S.C. § 2201, the Court declares that Plaintiffs Juan Carlos Borunda and Mario Alberto Borunda are United States citizens by birth.

5. In addition to a declaration as to their citizenships, Plaintiffs in their complaint pray for several forms of injunctive relief. Specifically, Plaintiffs ask that the Court (1) declare that the revocations of their passports are null and void; (2) enjoin Defendant from denying Plaintiffs' passport applications; (3) direct Defendant to reinstate their passports; and (4) direct Defendant to proceed with Plaintiff Mario Alberto Borunda's petition to

legally immigrate his wife and child to the United States.[1] However, 8 U.S.C. § 1503(a) merely allows a plaintiff to institute an action for a judgment declaring him to be a national of the United States. Accordingly, no other relief is directly available to Plaintiffs under this statute.

6. Plaintiffs also indicated at the conclusion of trial that they will be seeking fees and costs from Defendant pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412. Although judgment shall issue concurrently with these Findings and Conclusions, the Court retains jurisdiction over such matters. **Plaintiffs will file the appropriate motion within two weeks of the entry of these Findings and Conclusions.** Any such motion must cite authority in support of the legal positions advanced. Briefing on the motion will proceed as set forth in this Court's Local Rules. *See* D.N.M.LR-Civ. 7.4(a).

7. Any finding of fact that is more appropriately a conclusion of law shall be deemed a conclusion of law. Any conclusion of law that is more appropriately a finding of fact shall be deemed a finding of fact.

8. A Judgment consistent with these findings and conclusions shall be entered in favor of Plaintiffs Juan Carlos Borunda and Mario Alberto Borunda, and against Defendant John F. Kerry, in accordance with Federal Rule of Civil Procedure 52(a)(1).

**SO ORDERED**

_____
UNITED STATES DISTRICT JUDGE

---

[1] At the time the complaint was filed, Plaintiff Mario Alberto Borunda's passport had not yet been officially revoked. By the time this matter had proceeded to trial, that passport had been revoked. At the conclusion of trial, Plaintiffs requested that the Court direct Defendant to nullify Plaintiff Mario Alberto Borunda's passport revocation, just as they had earlier prayed for such relief with respect to Plaintiff Juan Carlos Borunda's passport revocation. Because such relief is not available under § 1503(a) in any event, the Court does not address this matter further.